FILED & JUDGMENT ENTERED
David E. Weich

Aug 09 2005

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

_George R. Hodges_
George R. Hodges
United States Bankruptcy Judge

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| FOWLER'S BURIED WIRE SERVICE INC. | § | CASE NO. 02-10680 |
| | § | |
| Debtor. | § | Chapter 7 |
| -------------------------------------------------- | § | -------------------------------------------------- |
| | § | |
| ROBERT M. PITTS, Chapter 7 Trustee, | § | Adv. Proceeding No. 04-01040 |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| GRAYBAR ELECTRIC COMPANY, INC. | § | |
| Defendant. | § | |
| -------------------------------------------------- | § | -------------------------------------------------- |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter is before the court on the non-jury trial of the Trustee's Complaint and the defendant Graybar Electric Company's Counterclaim.  The Trustee seeks to recover money paid to Graybar by a third-party that the Trustee asserts was an account receivable of the debtor.  The court has concluded that the "account receivable" was not property of the debtor's estate and

may not be recovered by the Trustee.  The court has further concluded that there is no merit to Graybar's counterclaim.

The case was well tried by both parties.  Based on the evidence and arguments they presented, the court makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

#### Subject Matter Jurisdiction

1.      This is a case of bankruptcy jurisdiction, and is a core proceeding under 28 U.S.C. §157(b)(2)(F).

#### Parties

2.      Plaintiff, Robert M. Pitts (the "Trustee") was appointed as Trustee in the chapter seven bankruptcy proceeding of Fowler's Buried Wire Services, Inc. (hereinafter, "Fowler's Buried Wire" or "Debtor")

3.      Defendant, Graybar Electric Company, Inc. ("Graybar") is a corporation organized under the law of the State of Missouri, and does business in the State of North Carolina.

#### Construction Agreement

4.      In December 2001, Fowler's Buried Wire, as general contractor, and TDS Telecom Service Corporation ("TDS"), as owner, entered into a series of agreements entitled Telephone System Construction Master Contract ("Construction Agreement") to supply and install electrical materials for construction of improvements to real property located in the State of Georgia and owned by TDS and its affiliates (the "Georgia real property").  The Construction Agreement contained the following provisions:

2

Article III - Payments and Release of Liens

Section 1.  Payments to Contractor

"(d.)   No payment shall be due while the Contractor is in default in respect, of any of the provisions of this Contract and the Owner may withhold from the Contractor the amount of any claim by a third party against either the Contractor or the Owner based upon an alleged failure of the Contractor to perform the work hereunder in accordance with the provisions of this Contract"

Section 2. Certificate of Contractor and Indemnity Agreement

"At the request of the Owner upon completion of a Build Order, the Contractor shall deliver to the Owner in duplicate, a certificate that all manufacturers, materialmen, and subcontractors who have furnished services or materials have been paid in full, and an agreement to hold the Owner harmless against any liens arising out of the Contractor's performance hereunder which may have been or may be filed against the Owner . . ."

Section 3.  Payments to Materialmen and Subcontractors.

"The Contractor shall pay each materialman, and each subcontractor if any, within five (5) days after receipt of any payment from the Owner, the amount thereof allowed the Contractor for and on account of materials furnished or construction performed by each materialman or each such subcontractor".

**Graybar Sold and Delivered Materials to Debtor to Improve the Georgia real property**

5.      Between January 1, 2002 and July 31, 2002, Graybar sold and delivered wire, cable, and other electrical materials to Debtor for incorporation into the Georgia real property. As the invoices for those materials came due, Debtor failed to pay Graybar.  By failing to pay Graybar, Debtor defaulted on its obligations to Graybar and on its obligations to TDS under the Construction Agreement.

6.      It appears that the materials sold to Debtor by Graybar were shipped to the Georgia real property (and thus Georgia lien law would apply).  Graybar's controller was adamant that the money it received from TDS was for shipments to the Georgia project.  That is

3

consistent with Graybar's contemporaneous documents, including its lien waiver. The Trustee offered several exhibits from TDS's records that indicate about $5,000 of materials may have been destined for North Carolina projects.  The Trustee asserts that these exhibits demonstrate that those materials were not shipped to Georgia.  While that is a logical and reasonable conclusion from the notations on these exhibits, it is not the only explanation that may be drawn from the documents.  Consequently, these documents are not probative on that issue.  For example, it may be that although these materials were ultimately destined for the North Carolina projects, they may have been shipped to the Georgia warehouse.  Therefore, the court finds that the best evidence is that all of the materials representing the $51,518.73 payment to Georgia and were subject to Graybar's lien rights pursuant to Georgia law.

### Fowler's Buried Wire's Bankruptcy Petition

7.    On June 24, 2002, Fowler's Buried Wire filed its bankruptcy petition under chapter 11 of the Bankruptcy Code.  The case was converted later to one under chapter 7. Almost immediately after Fowler's Buried Wire's chapter 11 bankruptcy filing, Graybar took steps to enforce its lien rights as a material supplier to the Georgia real property.

### Notice of Graybar's Lien Claim Against TDS

8.    On June 28, 2002, Graybar sent a notice letter to TDS of Graybar's lien claim against the Georgia real property in the amount of $121,862.84.  After applying an anticipated $50,000.00 payment as partial settlement of the claim against a construction bond issued by Cincinnati Insurance Company, Graybar's lien claim against the Georgia real property was reduced to $71,862.84.

**Postpetition Agreement Between Debtor, TDS, and Graybar**

9.     On July 11, 2002, Debtor, TDS, and Graybar entered into an agreement (the "Postpetition Agreement") whereby Debtor consented to the payment by TDS to Graybar directly for materials supplied by Graybar to improve the Georgia real property.  Although Debtor made this agreement without consulting its attorney (and contrary to his subsequent advice), it was within Debtor's authority and business judgment to do that.  Negotiation of trade and credit terms was a normal and regular part of Debtor's business.  Therefore, the Postpetition Agreement was made by Debtor within the ordinary course of its business.

**TDS Paid $51,518.75 to Graybar as Partial Settlement of Its Lien Claim**

10.     On October 11, 2002, TDS paid $51,518.75 to Graybar as partial settlement of its lien claim pursuant to TDS' obligations under Georgia law, under the Construction Agreement, and under the Postpetition Agreement.  On October 31, 2002, Graybar signed a Partial Release and Waiver of Lien against the Georgia real property in exchange for the $51,618.75 payment.

**Preference Action**

11.     On August 27, 2004, the Trustee filed this adversary proceeding under Section 549 and 550 against Graybar to recover the $51,518.75 payment from TDS as an unauthorized postpetition transfer to pay a prepetition debt.

**CONCLUSIONS OF LAW**

12.     A post petition transfer may be avoided only if it is a transfer of property of the debtor's bankruptcy estate.  11 U.S.C. §549(a).  Whether specific property is part of the debtor's estate is a question of state law.  *Mid-Atlantic Supply, Inc. of Virginia v. Three Rivers Aluminum Co.*, 790 F.2d 1121, 1126 (4th Cir. 1986).  The $51,518.75 payment by TDS to Graybar was not

property of Fowler's Buried Wire's bankruptcy estate.  Under Georgia law – in circumstances similar to those to the case at bar – payment by an owner to a subcontractor of a general contractor-debtor is not property of the debtor's estate.  See *United Parcel Service, Inc. v. Weben Industries, Inc.*, 794 F.2d 1005 (5th Cir. 1986);  *Cutler-Hammer, Inc. v. Wayne*, 101 F.2d 823, 825 (5th Cir. 1939);  *Bethlehem Steel Corp. v. Tidwell*, 66 B.R.932 (M.D. Ga. 1986);  *Mullins v. Noland Co.*, 406 F.Supp. 206 (N.D. Ga. 1975).   Furthermore, a payment made under an independent, contractual obligation by a third party (TDS) to the creditor (Graybar) of that third party's creditor (Fowler's Buried Wire) is not property of the estate of the third party's creditor. See *In re Davidson Lumber Sales, Inc.*, 66 F.3d 1560, 1567-68 (10th Cir. 1995)(*citing In re Arnold*, 908 F.2d 52, 56 (6th Cir. 1990);  *In re Flooring Concepts*, 37 B.R. 957, 961 (9th Cir. 1984);  *In re Trinity Plastics, Inc.*, 138 B.R. 203, 207 (Bankr. D.S. Ohio, 1992)).

### A.   TDS Had an Independent Obligation Under Georgia Law to Pay Graybar

13.   Graybar was a material supplier who sold and delivered materials directly to the general contractor, Fowler's Buried Wire, and had a lien against TDS' Georgia real property in the amount of $129,035.08 as of July 29, 2002.  O.C.G.A. § 44-14-361.   Under Georgia law, Graybar had three months after the last of its materials were delivered to the Georgia real property to record its lien; i.e., perfect its lien claim.  O.C.G.A. § 44-14-361.1(a)(2);  *Bethlehem Steel Corp. v. Tidwell*, 66 B.R.932, 940-41 (M.D. Ga. 1986)(Under Georgia law a materialman's lien rights attach following the first delivery of materials to be used on a job and expire ninety (90) days following the date of the last delivery, and the lien relates back to cover all items delivered, including those items delivered more than ninety days prior to the filing of the lien"); *See also Mullins v. Noland Co.*, 406 F.Supp. 206, 211(N.D. Ga. 1975).

14.     Graybar's final sale and delivery of materials to Fowler's Buried Wire for construction of improvements to the Georgia real property was made on July 29, 2002. Accordingly, Graybar had until October 28, 2002 to record its lien in the real property records of Georgia.  The subject payment of $51,518.75 was made to Graybar by TDS to satisfy Graybar's lien claim on October 11, 2002**,** at least seventeen days prior to the statutory deadline. Acceptance of the payment by Graybar resulted in a release and waiver of Graybar's right to record a lien against the Georgia real property in the amount paid.

15.     Federal and state courts in Georgia have firmly established that direct payment to a subcontractor by an owner against whom the subcontractor has lien rights is not a transfer of funds owing to the general contractor who failed to pay its subcontractor under their contract. Georgia law places on the owner of a construction project an independent duty to make sure subcontractors and materialmen who provide labor and materials to the project are paid by the general contractor.  *See Cutler-Hammer, Inc. v. Wayne*, 101 F.2d 823, 825 (5th Cir. 1939)("The purpose of the lien statutes . . . is to give the furnisher of labor and material a claim upon the owner, to compel him to withhold final payment until he has received assurance from the contractor that he has paid all material and labor claims, which are or may be perfected into liens");  *Henderson v. Mitchell Engineering Co.*, 158 Ga. App. 306, 308,  279 S.E.2d 750, 752 (1981)("[I]t is the owner's responsibility to see to it that the payments which he makes on the construction contract price are properly disbursed by the contractor to those having valid claims for labor and materials");  *Short & Paulk Supply Co. v. Dykes*, 120 Ga. App. 639, 643,   171 S.E.2d 782, 786 (1969).

### *Cutler-Hammer, Inc. v. Wayne*

16.     In *Cutler-Hammer*, the Fifth Circuit determined the effect of Georgia lien law on the status of construction funds held by an owner in the bankruptcy context .  *See Cutler-Hammer, Inc. v. Wayne*, 101 F.2d 823, 825 (5th Cir. 1939).  In that case, a subcontractor who supplied materials to the bankrupt general contractor asserted in the bankruptcy case that it was entitled – to the exclusion of general unsecured creditors of the debtor – to obtain the funds deposited into the registry of the court by the owner of the construction project.  *Cutler-Hammer*, 101 F.2d at 823-24.  The Court agreed and held Cutler-Hammer had priority to the funds in the amount of its inchoate lien claim because the funds were deposited by the owner to discharge the lien, "not as money of the estate, but as money of the lien claimants." *Id.* at 825.  The fact that the claimant's lien was inchoate – i.e., not yet perfected – did not defeat the priority status of the subcontractor's claim because there was still time to perfect the lien claim when payment was made by the owner. *Id.*

### *Mullins v. Noland Co*.

17.     Following the reasoning of the decision in *Cutler-Hammer*, the United States District Court in Georgia addressed whether a certain payment of construction funds to a materialman was an avoidable preference. *See Mullins v. Noland Co.*, 406 F.Supp. 206(N.D. Ga. 1975).  In *Mullins*, the Court held that payments by joint check from the general contractor to the bankrupt subcontractor and materialman were not preferential payments to the materialman because the funds were not property of the estate.  *Mullins*, 406 F. Supp at 210.  The Court found that the payments were made by the general contractor in fulfillment of its independent obligation under Georgia lien law to ensure that a materialman's claims and liens are satisfied.

*Id*. at 212-213.   Although the materialman had not yet perfected its lien by recording it, the Court held "even these inchoate rights take precedence over general creditors of the bankrupt contractor and hence the Trustee." *Id.* at 210.   The Court cited the Fifth Circuit's opinion in *Cutler-Hammer* and stated: "When [a bankruptcy case] supervenes, it does not take from laborers and materialmen funds devoted to their claims, to appropriate them to the general creditors, merely because some step in the procedure, which there is still time to take, has not been taken." *Id.* at 211.   The Court concluded that payments from an owner or contractor in satisfaction of a materialman's lien rights against the owner's real property "should not be set aside as voidable preference." *Id.*

### Application to Graybar's Defense

18.   In the present case, TDS, as owner of the Georgia real property, had an independent obligation under Georgia law to ensure that Graybar was paid for materials supplied to that property.   The TDS payment to Graybar was made in accordance with that independent obligation.   The payment, therefore, was not property of Fowler's Buried Wire's bankruptcy estate.   Although this case is not a Section 547 preference action, Sections 547 and 549 of the Bankruptcy Code both require a transfer to be property *of the debtor* to be avoidable by the trustee.   The cases cited herein stand for the proposition that funds paid by an owner to a materialman to satisfy a lien claim are not funds belonging to the bankrupt contractor; i.e., are not property of the estate.   When Graybar received payment from TDS, it still had time to record its lien.   By accepting payment, Graybar released its lien against TDS' real property.   The Trustee's preference action against Graybar cannot be maintained because the $51,518.75 payment by TDS was not property of the Debtor's estate.

### B.   The Funds Paid by TDS Were Held in Trust for Graybar

19.   Similar to the analysis of the prior section, the subject payment was not property of Fowler's Buried Wire's estate because the funds were held in trust by TDS for Graybar. Under 541(a)(1), a bankrupt's estate consists of "all legal or equitable interests of the debtor in property as of the commencement of the case", but does not include property that the debtor does not hold in his own right. *Mid-Atlantic Supply, Inc. of Virginia v. Three Rivers Aluminum Co.*, 790 F.2d 1121, 1124 (4th Cir. 1986). A trustee can take no greater rights in property than the debtor himself has. *Id.* (citing Senate Report No. 989, 95th Cong., 2nd Sess. 82 reprinted in 1978 U.S. Code Cong. & Ad. News, 5787, 5868). According to that same Senate Report, the limits on the trustee's rights applies particularly to property held in trust. *Id.* Cases decided subsequent to the Report recognized this limitation also. *In re Kennedy & Cohen*, 612 F.2d 963, 966 (5th Cir. 1980)("The court agrees with appellant that constructive trusts recognized by state law may be imposed against specified assets in appropriate circumstances, and those assets do not become part of the bankrupt's estate"). If property is held by a debtor in trust, the debtor's interest is legal only, and "legal title alone has been held to be of no value to the estate and the debtor will be required to reconvey the property or its substitute to the beneficial owner." *Mid-Atlantic*, at 1125 (citing *In re Butts*, 46 B.R. 292, 295 (D. N.D. 1985)). Once it is determined that funds held by a debtor are trust funds, the ultimate payment of the funds to the beneficiary is "the sole permissible administrative act" of the trustee or debtor in possession in regards to those funds. Id. at 1126. As demonstrated in the following cases, Georgia law imposes a trust on construction funds held by the owner for the benefit of materialmen who provided materials to a construction job without payment.

10

### *United Parcel Service, Inc. v. Weben Industries, Inc.*

20.     The Fifth Circuit recognized the Georgia trust fund doctrine in its review of the *Cutler-Hammer* opinion.  *See United Parcel Service, Inc. v. Weben Industries, Inc.*, 794 F.2d 1005 (5th Cir. 1986).  In *Weben Industries*, the dispute was between CoMaster – a lien claimant who performed construction work for the debtor, Weben Industries –  and Mercantile National Bank – a creditor who had a security interest in the accounts receivable of Weben Industries. *Weben*, 794 F.2d at 1006.  As the owner did in the *Cutler-Hammer* case, UPS deposited into the registry of the court  money due under a construction contract with Weben Industries.  *Id.*  As a lien claimant against UPS' real property, CoMaster sought payment of its entire claim in the amount of $131,886.15 from the interplead funds.  *Id*. at 1007.  CoMaster argued the interplead funds constituted a construction trust fund from which CoMaster's claim must be paid.  *Id*. Mercantile National Bank argued that the interplead funds constituted an account receivable of Weben Industries.  *Id*.

21.     The Court agreed with CoMaster and held it was entitled to the registry funds in the amount of its lien claim because those funds were trust funds, and not property of the bankruptcy estate of Weben.  *Id*. at 1007.  Citing a myriad of state and federal court decisions in Georgia, the Court declared the trust fund doctrine is rooted in the owner's obligation under Georgia lien law to make sure subcontractors get paid.  *Id*.  at 1009-10.

### *Bethlehem Steel Corp. v. Tidwell*

22.     The Georgia trust fund theory has been adopted as a valid defense in a bankruptcy preference action as well.  *See Bethlehem Steel Corp. v. Tidwell*, 66 B.R.932 (M.D. Ga. 1986). In *Tidwell*, the trustee of the estate of Georgia Steel, Inc. brought a preference action against

Bethlehem Steel under Section 547 of the Bankruptcy Code to recover payments made by Georgia Steel to its subcontractor, Bethlehem Steel, prior to the bankruptcy filing. *Id*. at 933. Bethlehem Steel sold steel to Georgia Steel to fulfill its obligation under a construction contract with Brown & Williamson Tobacco Co. *Id.* After receiving payment from Brown & Williamson, Georgia Steel then paid Bethlehem Steel. *Id*. at 934. All of the payments were made within ninety days after the last of Bethlehem Steel's materials were delivered to the Brown & Williamson job site. *Id.* The Bankruptcy Court determined that the payments were avoidable preferences, but the District Court reversed that decision. *Id.*

23.     The District Court presented the following issue: "Whether a contractor has any property rights in payments made to it by an owner of real estate improved by the contractor if the payments are made to satisfy materialman's claims that are either already secured by valid liens on the owner's property, or are capable of being secured by a valid lien at the time the payment is made". *Id*. at 935. The Court answered in the negative, and in so doing reiterated the decision of the Fifth Circuit in *UPS v. Weben Industries*, and adopted the entire reasoning of that court. *Id*. at 936-939.

24.     The Court concluded that Georgia law recognizes the trust fund doctrine with respect to payments owed to materialman by their contractors for improvements made to a third party's realty. The Court also held that those payments are not property of the contractor-debtor's estate. *Id*. at 939-40. The fact Bethlehem Steel had not actually recorded its lien against Brown & Williamson's property at the time it was paid did not change the Court's rationale because Bethlehem Steel still had the authority under Georgia law to file its lien at the time of payment. *Id*. at 939. The Court determined that the construction trust fund doctrine is a

12

supplement to Georgia lien law where a materialman gets paid before the 90 day lien deadline, and thus loses its ability to secure its claim against the owner's real property. *See Id.* ("[The] inability on the part of materialmen to protect themselves under Georgia's lien laws from a contractor's subsequent bankruptcy, once they have been paid for the materials supplied, further supports a finding that the constructive trust fund doctrine in Georgia would be available to these materialmen"). The Court approved the application of the trust fund doctrine in this situation, noting otherwise the trustee could avoid the payments in frustration of the purpose of the Georgia lien statutes. *Id.* To fail to apply the trust fund doctrine "would compel lienors to forego a reasonable commercial practice that is designed to carry a swift settlement of the respective parties' rights and obligations, in favor of insisting on enforcement of their lien rights, thereby creating an unnecessary and expensive impediment to the prompt settlement of construction contracts." *Id. See also Mullins*, 406 F. Supp. at 213-214.

### Application to Graybar's Defense

25.    The funds paid by TDS to Graybar were held in trust for Graybar, who provided materials for the construction of improvement to the Georgia real property. The funds, therefore, were not property of Fowler's Buried Wire's bankruptcy estate, and the $51,518.75 payment is not avoidable by the Trustee. As aptly stated in the *Tidwell* case, to hold otherwise would disrupt commercial dealings and the efficient resolution of lien claims.

### C.    TDS Was Contractually Obligated to Pay Graybar

26.    A payment made by a third party (TDS) to the creditor (Graybar) of that third party's creditor (Fowler's Buried Wire) under an independent contractual obligation is not property of the estate of the third party's creditor. *See In re Arnold*, 908 F.2d 52, 56 (6th Cir.

1990); *United Parcel Service, Inc. v. Weben Industries, Inc.*, 794 F.2d 1005 (5th Cir. 1986); *In re Flooring Concepts*, 37 B.R. 957, 961 (9th Cir. 1984).

### *In re Flooring Concepts*

27.    In a review of an avoidable preference action, the Ninth Circuit examined a three-way agreement between the subcontractor-debtor, its supplier, and its general contractor, whereby the general contractor agreed to pay the supplier directly and the supplier agreed not to pursue its lien claims.  The Court held that the agreement created an independent obligation on the part of the general contractor to pay the supplier.  *In re Flooring Concepts*, 37 B.R. at 961.  The court stated: "Payments made by a contract debtor of a bankrupt to a creditor do not become property of the estate where there is an independent obligation on the part of the debtor to pay the creditor."  *Id*.  The Court held the payments by the general contractor to the supplier were not property of the estate and thus were not preferential transfers.  *Id*. ("A transfer of money or property to a creditor of a debtor, that does not issue from the property of the debtor, is not a preference").

### *United Parcel Service, Inc. v. Weben Industries*

28.    The Fifth Circuit in *Weben Industries* held a materialman is entitled to payment from the owner when the terms of the construction contract between the owner and contractor-debtor provide authorize the owner to pay materialmen directly to protect the owner's property from liens.  *UPS v. Weben*, 794 F.2d at 1008.  In *Weben Industries*, the general contract gave UPS the right to discharge any lien against its real property by retaining funds under the construction contract and using those funds to pay the lien claimant.  *Id*. Under the terms of the

contract, "Weben had no right to payment from UPS of the amount required to discharge CoMaster's claim." *Id.*

### *In re Arnold*

29.     The Sixth Circuit held that direct postpetition payments by a general contractor to a supplier of a subcontractor-debtor were not property of the estate because the payments were made in accordance with the general contractor's contractual obligations with the project owner to pay suppliers. *In re Arnold*, 908 F.2d at 55. The contract imposed an obligation on the general contractor to pay the supplier independent of the relationship between the general contractor and the debtor. *Id.*

### Application to Graybar's Defense

30.     Similar to the cases cited above, Article Three, Sections 1-3 of the Construction Agreement between TDS and Fowler's Buried Wire authorized TDS to pay material suppliers to prevent them from recording its lien against the Georgia real property. Because Fowler's Buried Wire breached the Construction Agreement by failing to pay Graybar, TDS exercised its rights thereunder by paying Graybar directly. Furthermore, the Postpetition Agreement – which was made by TDS, Graybar, and Fowler's Buried Wire in the ordinary course of Debtor's business – required TDS to make the direct payment to Graybar. Graybar did not perfect its lien claim as a result of the Postpetition Agreement and the payment made thereunder. The $51,518.75 payment made by TDS was a result of an independent obligation owed by TDS. Under the Construction Agreement and the Postpetition Agreement, Fowler's Buried Wire did not have the right to receive the $51,518.75 payment that TDS made to Graybar. Accordingly, the payment was not property of Fowler's Buried Wire's estate and is not avoidable by the Trustee.

15

### D.  <u>Conclusion</u>

31.    For the reasons stated herein, the Trustee shall recover nothing on his Complaint.

32.    Graybar's Counterclaim was not pursued at trial, and the Court finds it to be

without merit.  Accordingly, Graybar shall recover nothing on its Counterclaim.


**This Order has been signed electronically.**                    **United States Bankruptcy Court**
**The Judge's signature and Court's seal**
**appear at the top of the Order.**

16